IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

JEREMY GREER and ERIN GREER,          *
                                      *          AUG 15 2025
        Plaintiffs,                   *
                                      *                FILED
        v.                            *     CV 124-215
                                      *
BALFOUR BEATTY COMMUNITIES,           *
LLC, et al.,                          *
                                      *
        Defendants.                   *
                                      *

—————————

O R D E R

—————————

Before the Court are Defendants' partial motion to dismiss
(Doc. 8), demand for a bifurcated or trifurcated trial (Doc. 21),
and motion to withdraw the demand for a bifurcated or trifurcated
trial (Doc. 23). For the following reasons, Defendants' partial
motion to dismiss is **GRANTED**, and their motion to withdraw the
demand for a bifurcated or trifurcated trial is **GRANTED**.

## I. BACKGROUND

Plaintiffs, previously Defendants' tenants, initiated this
action on November 27, 2024, asserting claims arising out of
Defendants' alleged failure to provide them safe and habitable
housing. (Doc. 1.) Plaintiffs allege the following facts, which
the Court accepts as true for the purposes of Defendants' motion
to dismiss.

Plaintiff Jeremy Greer ("SFC Greer") is a retired member of the Georgia Army National Guard. (Id. at 3.) SFC Greer and his wife, Plaintiff Erin Greer ("Mrs. Greer"), previously lived on Fort Eisenhower in Augusta, Georgia, in housing managed by Defendants. (Id.) Defendants are a group of subsidiary companies of Balfour Beatty, PLC, that have been responsible for construction, management, and maintenance of on-base military housing at Fort Eisenhower since at least 2008. (Id. at 4, 8.)

Plaintiffs relocated to Fort Eisenhower after receiving permanent change of station orders in the summer of 2016. (Id. at 18.) They applied for and received an offer of on-base housing through Defendants. (Id.) Plaintiffs noticed upon inspection that the unit Defendants offered them (the "Balfour House") had numerous problems: an active roof leak, mold on the carpet, general uncleanliness, and dead bugs on the floors, counters, and in closets. (Id.) Unable to afford temporary lodging in the meantime, Plaintiffs accepted the Balfour House offer, and SFC Greer signed the lease on October 13, 2016. (Id.) Upon signing the lease, SFC Greer also signed a mold addendum (the "Addendum"), which required him to report any evidence of water leaks, excessive moisture, mold, or mildew, or trouble with the ventilation, air conditioning, and doors or windows. (Id. at 18-19.) While the lease required Defendants to repair the Balfour House, the Addendum

made clear Defendants were also obligated to remediate any mold issues. (Id. at 19.)

In December 2016, shortly after moving in, Plaintiffs noticed two bathrooms in the Balfour House had collected a black residue in the bathtub and shower areas. (Id.) The residue persistently reappeared despite Mrs. Greer's efforts to clean it, so Plaintiffs reported it to Defendants via work order as required by the Addendum. (Id.) Defendants' response, however, was that Mrs. Greer would "just have to clean more." (Id.) Mrs. Greer continued alerting Defendants to the residue over the course of the year, but eventually stopped once she realized Defendants were not going to address the problem. (Id.)

Over the next several years, Plaintiffs experienced additional issues with the Balfour House's HVAC, kitchen appliances, and roof, many of which Defendants did not remedy for a year or more after Plaintiffs first alerted them to the problem. (Id. at 21-23.) In the summer of 2019, Plaintiffs placed multiple work orders due to constant water leaks from the utility closet onto the driveway. (Id. at 24.) Defendants dismissed Plaintiffs' concerns about the leaks, saying the water in the utility closet was "just condensation" and posed no problems. (Id.) However, over Labor Day weekend, the hot water heater flooded the downstairs floor of the Balfour House. (Id.) Defendants dispatched a cleaning company, which cleaned up some of the water and instructed

3

Plaintiffs to attempt to dry out the remaining flooded areas. (Id.) Defendants told Plaintiffs they would return to finish the flood repair after Labor Day weekend was over, but they never did. (Id.) Plaintiffs noticed black mold growing in the Balfour House immediately after the flooding. (Id. at 25.)

Mrs. Greer was diagnosed with neutropenia in 2017, and her physician told her that exposure to fungus or bacteria could be lethal due to her diagnosis.[1] (Id.) Mrs. Greer was subsequently enrolled in the Department of the Army's Exceptional Family Member Program ("EMFP"), which entitled Plaintiffs to preferential on-base housing that accommodated Mrs. Greer's condition. (Id.) Defendants knew of Mrs. Greer's EMFP status. (Id.) Upon observing the mold growth after the 2019 flood, Mrs. Greer informed Defendants of the mold and explained to them that mold exposure could have devastating health effects given her condition. (Id.) In response, Defendants sent a third-party company and a professional cleaner to address the mold and water damage. (Id. at 26.) Mrs. Greer observed the third-party company scrape black mold off a pantry wall with a putty knife before painting over the mold. (Id.) The professional cleaner scraped a white residue off the floor and scrubbed the pantry walls with a Brillo pad. (Id.) When Mrs. Greer expressed to Defendants her dissatisfaction with

---

[1] Mrs. Greer does not contend she developed neutropenia because of the Balfour House conditions. (Doc. 1, at 25 n.14.)

the third-party company and professional cleaner's work, Defendants' maintenance supervisor stated, "[E]ven if there is black mold growing behind the wall or in the pantry, there is nothing that [Defendants are] going to do about it." (Id.) Mrs. Greer requested alternative on-base housing and visited Defendants' on-base office multiple times over the ensuing months regarding the mold, but to no avail. (Id. at 26-27.) By the end of October 2019, she realized Defendants did not intend to adequately address the mold and other issues in the Balfour House. (Id. at 27.)

Three years later, Plaintiffs hired Josh Rachal of Texas Mold Inspectors to inspect the Balfour House on September 28, 2022. (Id.) On September 30, 2022, Rachal provided Plaintiffs a "Statement Regarding Occupancy" (the "2022 Rachal Opinion") that deemed the Balfour House "unfit for human occupancy." (Id. at 35.) Plaintiffs immediately gave Defendants the 2022 Rachal Opinion and removed themselves from the Balfour House. (Id. at 37.) Defendants ignored Plaintiffs' requests for emergency relief, leaving Plaintiffs to sleep in their car or the Balfour House backyard for several days. (Id. at 37-38.) Nonetheless, Defendants continued to collect rent from money deducted from SFC Greer's housing allowance. (Id. at 38.)

After more than a week had passed, Defendants arranged for Plaintiffs to stay at a hotel until October 17, 2022, and informed

Plaintiffs they would repair the Balfour House during this time. (Id.) During their hotel stay, Plaintiffs went to the Balfour House while Defendants' subcontractor, Mark Hartz, performed an inspection. (Id. at 37.) It was clear to Plaintiffs from the start that Hartz was a "hired gun" whose job was to discredit the 2022 Rachal Opinion. (Id.) Hartz told Plaintiffs he would send them a report within a few weeks, but he never did. (Id.) When Plaintiffs returned to the Balfour House on October 17, 2022, they found black mold growing on the bedroom carpet. (Id. at 39.) However, Plaintiffs were financially unable to secure alternate housing until SFC Greer's retirement benefits came available in February 2023. (Id.) They signed a lease for new, off-base housing on February 28, 2023, though their furniture and belongings remained at the Balfour House until June 21, 2023. (Id. at 39, 45.)

On April 6, 2023, between the time Plaintiffs signed their new lease in February and moved their belongings in June, the downstairs bathroom flooded, depositing raw sewage in the dining room and entryway. (Id. at 41.) Defendants purported to clean up and repair the bathroom, but within a few hours, the same bathroom flooded again, sending sewage and water throughout the downstairs. (Id.) Defendants' cleanup efforts the second time left raw sewage strewn throughout the bathroom and hallway. (Id. at 44.)

On June 26, 2023, Rachal conducted a visual assessment of the Balfour House and delivered a follow-up report to determine whether mold remediation had taken place since his September 28, 2022 inspection. (Id. at 46.) His 2023 report stated the Balfour House "was and remains unfit for human occupancy." (Id. at 48.)

Plaintiffs were in good health before moving into the Balfour House. (Id.) Shortly after moving in, however, they developed various health problems including breathing issues, chest tightness, skin rashes, and coughing. (Id.) Additional symptoms such as extreme fatigue, migraines, blurry vision, and memory loss set in after around a year. (Id.) Immediately after cleaning the Balfour House upon moving out their belongings, Mrs. Greer had to go to the emergency room at Eisenhower Medical Center. (Id. at 45.) Medical staff there opined her symptoms were triggered by her presence and activity at the Balfour House. (Id.) On July 6, 2023, urinalysis reports for both Plaintiffs revealed the presence of five types of mycotoxins – toxins generated by mold - in their bodies. (Id. at 15, 49.)

Plaintiffs filed this action on November 27, 2024. (Doc. 1.) They assert against all Defendants claims of negligence, gross negligence, breach of contract, breach of implied warranty of habitability, constructive eviction, unjust enrichment, and fraud, and violations of the Georgia Fair Business Practices Act ("GFBPA") and Servicemembers Civil Relief Act ("SCRA"). (Id. at 51-62.)

7

Plaintiffs also assert joint and several liability and entitlement to punitive damages and attorney's fees against all Defendants. (Id. at 63-65.) On February 18, 2025, Defendants moved for partial dismissal of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 8.) Plaintiffs responded in opposition. (Doc. 14.)

On May 8, 2025, with their motion to dismiss still pending before the Court, Defendants filed a demand for a bifurcated or trifurcated trial (Doc. 21), to which Plaintiffs responded in opposition (Doc. 22). Defendants then moved to withdraw their demand for a bifurcated or trifurcated trial. (Doc. 23.) Upon due consideration, the Court **GRANTS** Defendants' motion to withdraw their demand for a bifurcated or trifurcated trial. (Doc. 23.) Defendants' demand (Doc. 21) is therefore **WITHDRAWN**, and the Clerk's Office shall **TERMINATE** the motion.

The Court now turns its attention to Defendants' partial motion to dismiss, which is ripe for review.


## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal if the complaint fails to state a claim upon which relief can be granted. The Court tests the legal sufficiency of the complaint in considering a Rule 12(b)(6) motion to dismiss. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), *overruled on other*

*grounds by* <u>Davis v. Scherer</u>, 468 U.S. 183 (1984). Rule 12(b)(6) works in tandem with Federal Rule of Civil Procedure 8(a)(2), which requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of both the claim and the supporting grounds. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citation omitted). Although "detailed factual allegations" are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 555).

A plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557). The court need not accept the pleading's legal conclusions as true, only its well-pleaded facts. <u>Id.</u> at 679. Furthermore, "the court may dismiss a complaint pursuant to [Rule 12(b)(6)] when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." <u>Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.</u>, 992 F.2d 1171, 1174 (11th Cir. 1993) (citing <u>Exec. 100, Inc. v. Martin Cnty.</u>, 922 F.2d 1536, 1539 (11th Cir. 1991)). Allegations in a complaint must be taken as true and

"read . . . in the light most favorable to the plaintiff[]." <u>Duke v. Cleland</u>, 5 F.3d 1399, 1402 (11th Cir. 1993) (citation omitted).

## III. DISCUSSION

Defendants move to dismiss Plaintiffs' claims of negligence (Count One), gross negligence (Count Two), and GFBPA violation (Count Nine) as to Mrs. Greer only, and of constructive eviction (Count Five), SCRA violation (Count Six), and unjust enrichment (Count Seven) as to both Plaintiffs. (Doc. 8.) The Court addresses each Count in turn.

### A. Negligence, Gross Negligence, and GFBPA Claims

Defendants contend Mrs. Greer's negligence, gross negligence, and GFBPA claims fail because they are untimely. (<u>Id.</u> at 7-11.) Defendants argue her negligence and gross negligence claims accrued by September 2019 and her GFBPA claim accrued by October 2019, so the complaint, filed November 27, 2024, was filed outside of Georgia's two-year statute of limitations period for personal injuries as codified in O.C.G.A. § 9-3-33 and GFBPA claims as codified in O.C.G.A. § 10-1-401(a)(1). (<u>Id.</u> at 9, 11.) Mrs. Greer asserts Georgia's continuing tort theory renders her negligence and gross negligence claims timely. (Doc. 9, at 2-6.) She also argues her negligence, gross negligence, and GFBPA claims are timely under Georgia's continuing violation doctrine and tolling provision pertaining to fraudulent conduct. (<u>Id.</u> at 2-8.) The

Court first considers whether her negligence and gross negligence claims are timely under the continuing tort theory.

    1. Continuing Tort Theory

    In Georgia, personal injury claims "shall be brought within two years after the right of action accrues." O.C.G.A. § 9-3-33. Generally, "the period within which a suit may be brought is measured from the date upon which the plaintiff could have successfully maintained the action." Armstrong v. Cuffie, 860 S.E.2d 504, 507 (Ga. 2021) (citations omitted); see also M.H.D. v. Westminster Sch., 172 F.3d 797, 804 (11th Cir. 1999) (noting that, under Georgia law, "the statute of limitations begins to run when the plaintiff's cause of action becomes legally cognizable"). For personal injury claims, "the statute of limitation commences at the time the damage or injury is actually sustained." Everhart v. Rich's, Inc., 194 S.E.2d 425, 428 (Ga. 1972).

    Georgia employs the discovery rule to determine the date of accrual when "the injury and the discovery of the causal relationship [with the tortfeasor's conduct] do not occur simultaneously." King v. Seitzingers, Inc., 287 S.E.2d 252, 254 (Ga. Ct. App. 1981). Under the discovery rule, the cause of action accrues only when the plaintiff "kn[ows] or through the exercise of reasonable diligence should have discovered not only the nature of his injury but also the causal connection between the injury and the alleged negligent conduct of [the tortfeasor]." Id. at

255.   Courts applying Georgia law have held the discovery rule applies to continuing torts, or those in which the plaintiff's injury develops "from prolonged exposure to the defendant's tortious conduct." Westminster Schs., 172 F.3d at 804-05 (citation omitted); see Waters v. Rosenbloom, 490 S.E.2d 73, 75 (Ga. 1997) ("Georgia courts have consistently held that in a continuing tort a cause of action accrues when a plaintiff discovers, or with reasonable diligence should have discovered, both the injury and the cause thereof." (citations omitted)).   However, when exposure to a hazard produces injury, but the victim remains exposed to the hazard because of the tortfeasor's "continued failure . . . to warn," the statute of limitation is tolled until "the continued tortious act producing injury is eliminated." Everhart, 194 S.E.2d at 428.   This "continuing tort theory applies only when the wrong and the injury are unknown to the plaintiff." Harvey v. Merchan, 860 S.E.2d 561, 569 (Ga. 2021) (citing Everhart, 194 S.E.2d 425).

Defendants contend Mrs. Greer's claims accrued no later than September 2019, when she informed Defendants that black mold was growing in the Balfour House and could be particularly harmful to her health. (Doc. 8, at 8-9 (citing Doc. 1, at 25-26).)   Plaintiffs disagree, arguing that the continuing tort theory tolled the statute of limitation for Mrs. Greer's claims at least until they obtained new housing on February 28, 2023. (Doc. 9, at 3.)   In support of their continuing tort theory argument, Plaintiffs rely

12

on <u>Ambling Mgmt. Co. v. Purdy</u>, 640 S.E.2d 620 (Ga. Ct. App. 2006), in which a tenant sued her previous landlord over health issues caused by a contaminant in her apartment. (<u>Id.</u> at 3-6.) <u>Ambling</u> applied the continuing tort theory to find that, even if the tenant's cause of action had accrued more than two years before she filed suit, the statute of limitation was tolled until either she removed herself from the premises or her landlord warned her of or tried to abate the hazard. 640 S.E.2d at 625-26.

Despite factual similarities between <u>Ambling</u> and the instant matter, extending <u>Ambling</u>'s holding here would require the Court to overlook a key element of the continuing tort theory: that it "tolls the statute of limitation so long as the continued exposure to the hazard *is occasioned by* the continued failure of the tortfeasor to warn the victim." <u>Ambling</u>, 640 S.E.2d at 625 (emphasis added) (quoting <u>Everhart</u>, 194 S.E.2d at 428). In other words, if the tortfeasor's failure to warn the victim does not *cause* the victim's continued exposure to the hazard, the continuing tort theory is inapplicable. <u>Harvey</u>'s observation that the theory "applies only when the wrong and the injury are unknown to the plaintiff" clarifies the subject; after all, once the plaintiff knows of the wrong and the injury, the tortfeasor's failure to warn the plaintiff can no longer be said to cause the plaintiff's continued exposure. 860 S.E.2d at 569 (citation omitted). The

operative question here, therefore, is when Mrs. Greer knew of "the wrong and the injury."[2] Id.

The Court finds Mrs. Greer's negligence and gross negligence claims accrued no later than September 28, 2022, the date Rachal informed Plaintiffs the Balfour House posed a serious risk to their health. (Doc. 1, at 27.)   While Defendants assert the claims accrued when she told Defendants in September 2019 the Balfour House contained mold that could have devastating effects on her health, the Court notes Plaintiffs do not clearly plead Mrs. Greer was already experiencing devastating health effects then that should have put her on notice of a causal relationship between her then-existing symptoms and the mold.   (See Doc. 8, at 9.)   Mrs. Greer's physician had warned her that "exposure to fungus or bacteria that might not be harmful to most people could have a potentially lethal effect on [her]."   (Doc. 1, at 25.)   By September 2019, both Plaintiffs had developed various symptoms such as migraines, nosebleeds, fatigue, and respiratory infections. (Id. at 48.)  But these symptoms were not specific to Mrs. Greer, nor does she allege they were potentially lethal, as

---

[2] While not central to Ambling's holding as to the statute of limitation issue, the Court finds it notable that the court there found evidence the tenant "did not have actual knowledge of the danger and did not know of the specific, particular risk of harm associated with conditions within her apartment" until shortly before she moved out, which was within two years of filing suit.   640 S.E.2d at 628-29 (citation omitted).

her physician had warned, such that she should have known they may have been caused by the mold. (Id. at 25, 48.)

But Rachal's September 28, 2022 inspection did put her on notice of such a causal connection. Mrs. Greer knew of the "wrong" before this date: she alleges observing mold growth in the Balfour House beginning in 2016, and by October 2019 believed Defendants "had no intention of sufficiently addressing the actively growing mold." (Id. at 18, 25.) Mrs. Greer also knew of the "injury" before this date: she developed "numerous" new health problems upon moving into the Balfour House in 2016. (Id. at 25.) Thus, when the 2022 Rachal Inspection revealed to Plaintiffs the general health risks attendant to the Balfour House's condition, Mrs. Greer knew or should have known of the causal connection between her then-existing health problems and Defendants' conduct.

Because Mrs. Greer knew of the claimed injury and its cause by September 28, 2022, her continued exposure to the hazardous conditions after that date was not caused by Defendants' failure to warn. Georgia's continuing tort theory therefore did not toll the statute of limitation for Mrs. Greer's negligence and gross negligence claims.

2. Continuing Violation Doctrine

Intertwined with Plaintiffs' continuing tort argument is their contention that the continuing violation doctrine renders Mrs. Greer's negligence, gross negligence, and GFBPA claims

timely.  (Doc. 9, at 3-6.)  The continuing violation doctrine provides that "where a continuing violation is found, the plaintiffs can recover for any violations for which the statute of limitations has not expired." Willis v. City of Atlanta, 595 S.E.2d 339, 342 (Ga. Ct. App. 2004) (quoting Knight v. Columbus, 19 F.3d 579, 581 (11th Cir. 1994) (alterations adopted)).  Mrs. Greer directs the Court to two district court cases applying the continuing violation doctrine to 42 U.S.C. § 1983 claims and, more relevant here, to two Georgia state court cases: Renasant Corp. v. Korst, 865 S.E.2d 606 (Ga. Ct. App. 2021), involving a state Fair Housing Act claim, and Willis, 595 S.E.2d 339, involving an unpaid wages claim.  (Doc. 9, at 2-3.)

The Court finds the continuing violation doctrine did not toll Mrs. Greer's negligence, gross negligence, and GFBPA claims. Most salient to the Court's reasoning is that Plaintiffs' cited authority suggests the continuing violation doctrine has been used only sparsely by Georgia state courts, and never in the context of a personal injury or GFBPA claim.  (Id. at 3 (citing Korst, 865 S.E.2d at 614; Willis, 595 S.E.2d at 343).)  The Court sees no reason to expand the doctrine beyond its current bounds.

### 3. Tolling Due to Fraud

Next, Mrs. Greer argues Defendants' allegedly fraudulent conduct tolled the statute of limitations for her negligence, gross negligence, and GFBPA claims until at least February 28, 2023.

16

(Id. at 6-8.)  To establish Defendants' fraud, Mrs. Greer points to her allegations that Defendants "would falsely state that adequate repairs [of reported issues] had been completed" or "assure the Greer family that the reported issue was not a problem." (Id. at 7 (citing Doc. 1, at 23-24, 26, 38-39, 41-44).)

In Georgia, when a civil defendant has committed a fraud "by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." O.C.G.A. § 9-3-96.

> A plaintiff who seeks to toll a limitation period under OCGA § 9-3-96 must make three showings: first, that the defendant committed actual fraud; second, that the fraud concealed the cause of action from the plaintiff, such that the plaintiff was debarred or deterred from bringing an action; and third, that the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation.

Doe v. Saint Joseph's Cath. Church, 870 S.E.2d 365, 371 (Ga. 2022) (citation and internal quotation marks omitted). "'Actual fraud' under Georgia law consists of five elements: (1) false representation or omission of a material fact, (2) scienter, (3) intention to induce the party claiming fraud to act or refrain from acting, (4) justifiable reliance, and (5) damages." Overstreet v. Worth Cnty., No. 21-14391, 2022 WL 4007460, at *5 (11th Cir. Sep. 2, 2022) (citation omitted). "The fourth element, justifiable reliance, is . . . normally a question for the jury." McLendon v. Georgia Kaolin Co., 782 F. Supp. 1548, 1561 (M.D. Ga.

1992) (citing <u>Brown v. Techdata Corp.</u>, 234 S.E.2d 787, 790-91 (Ga. 1977)). But a plaintiff's "actual knowledge of the alleged falsity establishes that [the plaintiff's] reliance was unjustifiable" as a matter of law. <u>Baranco, Inc. v. Bradshaw</u>, 456 S.E.2d 592, 593 (Ga. Ct. App. 1995).

The Court finds Mrs. Greer has not alleged justifiable reliance upon Defendants' representations about the Balfour House conditions or their intent to address the same after October 2019. By that time, "it was clear to Mrs. Greer that [Defendants] had no intention of sufficiently addressing the actively growing mold [or other defects] in the Balfour House." (Doc. 1, at 27.) Mrs. Greer asserts Defendants' fraud continued when they moved Plaintiffs into temporary housing and claimed to remediate the Balfour House's problems. (Doc. 9, at 7.) But any reliance on Defendants' promises of remediation was not reasonable after Plaintiffs found black mold upon moving back into the Balfour House in October 2022 - after the supposed remediation work was completed. (Doc. 1, at 39.)

Because Mrs. Greer knew Defendants did not intend to address the Balfour House problems after October 2019, despite Defendants' representations to the contrary, she has failed to allege an essential element of fraud. Therefore, she is not entitled to equitable tolling under O.C.G.A. § 9-3-96 for her negligence, gross negligence, and GFBPA claims.

18

For the foregoing reasons, the Court **GRANTS** Defendants'
motion to dismiss Mrs. Greer's claims in Counts One, Two, and Nine.

## B. Constructive Eviction Claim

Count Five asserts a claim of constructive eviction.    (Doc.
1, at 56-57.)  Defendants argue Count Five fails to state a claim
because Georgia law recognizes constructive eviction not as a cause
of action, but as an affirmative defense.    (Doc. 8, at 11-12.)
Plaintiffs disagree, contending Georgia law permits tenants to
recover damages for constructive eviction.    (Doc. 9, at 9 (citing
Anglin v. Moore, 771 S.E.2d 525, 526 (Ga. Ct. App. 2015) and
Roberts v. Roberts, 422 S.E.2d 253, 254 (Ga. Ct. App. 1992)).)

Courts applying Georgia law have long considered constructive
eviction to be an affirmative defense.    See Wellbaum v. Murphy,
178 S.E.2d 690, 691 (Ga. Ct. App. 1970) ("Constructive eviction
is, in our opinion, merely a specialized defense in rent cases
grounded on principles of general contract law respecting failure
of consideration."); Piano & Organ Ctr. v. Southland Bonded
Warehouse, Inc., 228 S.E.2d 615, 617 (Ga. Ct. App. 1976) (stating
the same); George v. Hercules Real Est. Servs., Inc., 795 S.E.2d
81, 89 (Ga. Ct. App. 2016) (noting "[t]wo essential elements must
be shown to establish the defense of constructive eviction"
(citation omitted and emphasis added)).  As Plaintiffs point out,
however, the Georgia Court of Appeals has recognized a tenant's
assertion of constructive eviction as a counterclaim.    See Anglin,

19

771 S.E.2d at 526 (affirming judgment for tenants who filed constructive eviction counterclaim in response to landlord's dispossessory action); Roberts, 422 S.E.2d at 254 (finding jury question existed as to tenant's entitlement to damages arising from landlord turning off water supply).

The Court agrees with Defendants that Plaintiffs may not assert constructive eviction as a cause of action under Georgia law.  Plaintiffs point to no case in which a Georgia court has recognized a plaintiff's affirmative claim of constructive eviction, and this Court finds no reason to be the first.  The Court therefore **GRANTS** Defendants' motion to dismiss Count Five.

## C. SCRA Claim

Count Six asserts a cause of action for violating a provision of the SCRA that prohibits a landlord from "evict[ing] a servicemember, or the dependents of a servicemember" from a residence "[e]xcept by court order."  (Doc. 1, at 57-58); 50 U.S.C. § 3951(a).  Defendants, citing Addi v. Corvias Mgmt.-Army, LLC, No. CV ELH-19-3253, 2020 WL 5076170 (D. Md. Aug. 27, 2020), argue Count Six fails to state a claim because constructive eviction is not actionable under the SCRA.  (Doc. 8, at 12-13.)  In response, Plaintiffs contend the statute's ban on evictions "except by court order" indicates it addresses conduct such as constructive evictions, so the Court should permit the claim to proceed to summary judgment.  (Doc. 9, at 8-9 (citing 50 U.S.C. § 3951(a)).)

Plaintiffs point to Yarbrough v. Hunt S. Grp., LLC, which found a failure to show constructive eviction at summary judgment precluded an SCRA claim based on the same. (Id. at 9 (citing No. 1:18CV51, 2019 WL 4345990, at *7 (S.D. Miss. Sept. 12, 2019), aff'd per curiam, 836 F. App'x 238, 241 (5th Cir. 2020) ("[B]ecause there was no constructive eviction, there can be no claim under the SCRA.")).)

As noted above, the SCRA provides a cause of action for servicemembers and their dependents who are "evict[ed]" by means other than a "court order." 50 U.S.C. § 3951(a). Because the SCRA does not define "evict," the Court turns to the dictionary definition. See In re Walter Energy, Inc., 911 F.3d 1121, 1143 (11th Cir. 2018) ("When a statute does not define a term, . . . [courts] often look to dictionary definitions for guidance [as to the term's ordinary meaning]."). Black's Law Dictionary defines "evict" as, "To expel . . . from real property." EVICT, Black's Law Dictionary (12th ed. 2024). It also defines "expel" as, "To drive out or away; to eject, esp[ecially] with force." EXPEL, Black's Law Dictionary (12th ed. 2024).

The Court declines to read the SCRA so broadly as to extend "eviction" to include constructive evictions. The Court is not swayed by the Fifth Circuit's opinion in Yarborough, which had no need to decide whether constructive eviction was actionable under

the SCRA because it found no constructive eviction occurred under Mississippi law. 836 F. App'x at 241. And Plaintiffs point to no other case that has provided a cause of action under the SCRA for constructive evictions. Further, the SCRA's prohibition on evictions "except by court order" indicates that any eviction contemplated therein – permissible or not – involves an affirmative action by the landlord to remove the tenant from the property, not the landlord's failure to maintain the property. The dictionary definitions of "evict" and "expel," noted above, likewise indicate an affirmative action taken to remove the tenant from the property. For these reasons, the Court declines to find a cause of action for constructive evictions under the SCRA and **GRANTS** Defendants' motion to dismiss Count Six.

## D. Unjust Enrichment Claim

Count Seven asserts a claim for unjust enrichment. (Doc. 1, at 58.) Defendants argue Count Seven must be dismissed because "Plaintiffs admit a valid and enforceable contract [i.e., the lease agreement] expressly covers the circumstances of that claim." (Doc. 8, at 13-14.) Plaintiffs consent to dismissal of Count Seven so long as Defendants do not intend to dispute the validity or enforceability of the lease agreement. (Doc. 9, at 8.) Defendants did not file a reply, but their principal brief indicates they accept the lease agreement's validity and enforceability. (Doc. 8, at 14-15 (noting unjust enrichment claim "is only available in

the absence of an enforceable contract" and dismissal of claim is proper when neither side disputes contract's validity (citing Emmer v. Wabii Branding, Inc., 1:21-CV-03370, 2022 WL 22886642, at *16 (N.D. Ga. Aug. 8, 2022) and Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp., 1:05-CV-1714, 2006 WL 1877078, at *9-10 (N.D. Ga. July 5, 2006)))).)  Therefore, the Court **GRANTS** their motion to dismiss Count Seven.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to withdraw its demand for a bifurcated or trifurcated trial (Doc. 23) is **GRANTED.** Defendants' demand for bifurcated or trifurcated trial (Doc. 21) is **WITHDRAWN**, and the Clerk shall **TERMINATE** the motion. Furthermore, Defendants' partial motion to dismiss (Doc. 8) is **GRANTED**.  Counts One, Two, and Nine are **DISMISSED** as to Mrs. Greer, and all Plaintiffs' claims in Counts Five, Six, and Seven are **DISMISSED**.

**ORDER ENTERED** at Augusta, Georgia, this _15th_ day of August, 2025.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA